## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT
### HARTFORD DIVISION

| | |
|---|---|
| LORIANNE JESKA, JULIA IASSOGNA, and TYOKA BRUMFIELD, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>- against -<br><br>BLUE DIAMOND GROWERS,<br><br>Defendant | Class Action Complaint<br><br>Jury Trial Demanded |

Lorianne Jeska ("Plaintiff Jeska"), Julia Iassogna ("Plaintiff Iassogna"), and Tyoka Brumfield ("Plaintiff Brumfield") ("Plaintiffs"), allege upon information and belief, except for allegations about Plaintiffs, which are based on personal knowledge:

## I.    SMOKED FOODS IN NEW ENGLAND

1.    Smoking is a processing method to preserve or improve the flavor of food by exposing it to smoke from burning hardwoods.

2.    Though early colonial settlers arrived in New England with knowledge of smoking techniques, these were based on the use of hickory wood, not available in America.

3.    The indigenous Wampanoag and Algonquian peoples of southern New England taught Europeans how to use dried corn cobs in place of hickory for

smoking foods, to preserve fish, meat, game, and nuts over the long winters.

4.    These practices led to New England being home to the nation's earliest smokehouses, defined by Oxford as "[A] house or room used for curing meat, fish, etc., by means of smoke."[1]



5.    Though modern smokehouses differ significantly from those created by early New Englanders, they still involve the movement of air to apply smoke and heat generated from burning hardwoods.

---

[1]https://www.middletownpress.com/living/article/Master-stone-artisan-rebuilds-old-smokehouse-11756513.php

Traditional



Modern

6.    Smokehouses in New England are more than a stop on a historical tour, with Newington Meat & Catering selling "Smokehouse Fresh Meats," and B.T.'s Smokehouse serving meats and other foods prepared by being smoked over hardwoods.

 

7.     This regional knowledge of smoking foods is evident by numerous New England companies that apply "smoke[d] low & slow" to impart true smoked tastes.



8.     These include New England Smokehouse Jerky, North Country Smokehouse, and Tiede Farms Smokehouse, which produce meats, cheese, nuts,

fish, and other staples by applying smoke generated from burning hardwoods.






9.    Connecticut consumers can purchase Smokehouse Beef Hot Dogs and Smokehouse Tilsit cheese, from regional companies like Sahlen's, in Buffalo, New York, and the Vermont Farmstead Cheese Company, which apply real wood smoke

from the burning of hardwoods.

 

## II.   INCREASE IN SMOKING APPLIED TO NUTS

10.   While the main types of foods subjected to smoking are generally meats and cheeses, the past decade has seen a significant increase in the application of wood smoke to nuts.

11.   This is due to their increased consumption, as consumers become more aware of the nutritional benefits of this convenient snack.[2]

12.   The result has been the availability of a variety of nuts, such as pistachios, pecans, peanuts, almonds, and walnuts, which are prepared with the application of wood smoke.

---

[2] Global Market Insights, Nuts Market.

13.    Unlike meats and cheese which require complex and capital-intensive machinery, applying wood smoke to nuts is a simple two-step process.

14.    First, a brine solution of partially dissolved salt in warm water is applied to the nuts in metal trays.

15.    Second, the trays are placed inside the smokehouse or similar contraption used for the generation of woodsmoke for several hours.

16.    When completed, it is common for a thin layer of salt to coat the nuts.

17.    Nuts prepared through the application of wood smoke are sold to consumers by companies including Nuts Aboutcha's Hickory Smoked Almonds, Smoke Shack Snacks' Smoky, Spicy Blend of Almonds, Pecans, & Walnuts, Smokey Mack's Smoked Cashews, Crimson Cove's Real Wood Smoked Smokehouse Almonds, and West Worcester Woodfired's Smoked Nuts.






## III.  DEMAND FOR SMOKED FOODS

18.    During the second half of the twentieth century, the use of smoke from burning hardwoods decreased due to technology which condensed the flavor of smoke into a liquid form, known as pyroligneous acid.[3]

19.    For several reasons, the past decade has seen a resurgence in demand for foods smoked over hardwoods instead of using added smoke flavoring.

20.    First, consumers increasingly value foods made through traditional production methods.[4]

21.    According to researchers, "Cues signaling traditional production seem to

---

[3] Matthew Sedacca, Liquid Smoke: The History Behind a Divisive Culinary Shortcut – Barbecue's love/hate relationship with the manufactured flavor, Eater.com, Jun 15, 2016.
[4] Del Giudice, Teresa, Carla Cavallo, and Riccardo Vecchio. "Credence attributes, consumers trust and sensory expectations in modern food market: is there a need to redefine their role?." International Journal on Food System Dynamics 9.1012-2018-4128 (2018).

affect liking in a positive direction, whereas signals of 'modernity' or 'industrialized food' seem to have a negative impact on liking."[5]

22.   Second, according to a survey of consumers by the International Food Information Council ("IFIC"), almost thirty percent of Americans consider additives in food a top concern.[6]

23.   Additives refer to chemical ingredients created in laboratories to imitate a specified taste that typically comes from ingredients or a process by which a food was made.

24.   According to one observer, "Our foods are laden with additives that are meant to enhance flavor [] that research has shown are either bad for people to consume or inconclusively so."[7]

25.   This factor is especially relevant since reports from the European Food Safety Authority ("EFSA") revealed that many liquid smoke flavorings contain compounds at levels which may pose a toxic risk when consumed.[8]

26.   According to Jonathan Brown, known as "JB," founder of industry

---

[5] Fernqvist, F. and Ekelund, L. (2014) Credence and the effect on consumer liking of food – A review. Food Quality and Preference. Volume: 32, Part C, pp 340-353.
[6] Tom Neltner, Environmental Defense Fund, Chemicals Policy Director, Chemicals in food continue to be a top food safety concern among consumers, Food Navigator, Sept. 20, 2021.
[7] Cary Funk et al., Public Perspectives on Food Risks, Pew Research Center, Nov. 19, 2018.
[8] Faizah Ahmed, Smoke-Flavored Foods May Be Toxic, Food Safety News, Feb. 16, 2010.

leader Smoke Shack Snacks, "An[] advantage of natural smoking is that it can be a healthier option, as it often involves using natural materials and avoids the potential health risks associated with artificial additives."[9]

27.   Finally, "natural smoking…can create a complex and authentic flavor profile that is difficult to replicate with artificial flavorings," because the former has a balance of phenolic compounds, such as 2,3-Butanedione, 2,3-Pentanedione, 3-Butanoic acid, 3-Methylbutanoic acid, 4-Ethylguaiacol, 4-Propylguaiacol and/or 4-Vinylguaiacol, created from burning hardwoods.

## IV.  LEGAL BACKGROUND

28.   Over 100 years ago, consumers were similarly concerned, based on the reports of muckraking journalists, about the harmful and untested chemicals added to their foods to substitute for the natural production processes they were familiar with, like barbecuing and applying wood smoke.

29.   In response to this unregulated environment, the Pure Food and Drug Act of 1906 established requirements for what companies were required to tell the public about the potentially harmful flavorings added to their foods.

30.   This  requirement was strengthened by the Federal Food, Drug and Cosmetic Act ("FFDCA") in 1938. 21 U.S.C. § 301 *et seq.*

31.   This State adopted these laws through the Connecticut Food, Drug, and

---

[9]Why is Natural Smoking Better Than Smoke Flavoring?, Smoke Shack Snacks.

Cosmetic Act ("CFDCA") and accompanying regulations. Conn. Gen. Stat. § 21a-91 *et seq.*[10]

32. The newly established Food and Drug Administration ("FDA") was aware of how companies used advanced scientific knowledge to substitute lower cost, dangerous, and unhealthy flavor chemicals to imitate the tastes provided by natural ingredients and production processes sought and expected by consumers.

33. The FDA knew how "consumers initially [] rely on extrinsic cues such as visual information on labels and packaging" and that they "value[d] 'the real thing' versus a close substitute and should be able to rely on the label to readily distinguish between the two."[11, 12]

34. This resulted in requirements that a food's name tell a purchaser of "its

---

[10] Regs., Conn. State Agencies § 21a-115-48 ("Food labeling shall be identical to 21 C.F.R. [Part] 101, Subpart A to Subpart G, inclusive, except for 21 C.F.R. § 101.69 and 21 C.F.R. § 101.108."); Regs., Conn. State Agencies § 21a-115-49 ("Common or usual names for nonstandardized foods, those foods for which a standard of identity has not been established pursuant to section 21a-100 of the Connecticut General Statutes, shall be identical to 21 C.F.R. [Part[ 102, Subpart A to Subpart B, inclusive, except for 21 C.F.R. § 102.19.")

[11] Steven Steinborn, Hogan & Hartson LLP, Regulations: Making Taste Claims, PreparedFoods.com, Aug. 11, 2006.

[12] Lancelot Miltgen et al., "Communicating Sensory Attributes and Innovation through Food Product Labeling," Journal of Food Products Marketing, 22.2 (2016): 219-239; Helena Blackmore et al., "A Taste of Things to Come: The Effect of Extrinsic and Intrinsic Cues on Perceived Properties of Beer Mediated by Expectations," Food Quality and Preference, 94 (2021): 104326; Okamoto and Ippeita, "Extrinsic Information Influences Taste and Flavor Perception: A Review from Psychological and Neuroimaging Perspectives," Seminars in Cell & Developmental Biology, 24.3, Academic Press, 2013.

characterizing properties or ingredients," such as the source of its taste. 21 C.F.R. § 102.5(a); 21 C.F.R. § 101.22(i)(1).

## V.   LABELING IS MISLEADING

35.   To appeal to consumers seeking foods which get their taste from their highlighted ingredients and natural production processes, without additives, Blue Diamond Growers ("Defendant") sells almonds purporting to be smoked over hardwoods, with "Smokehouse Almonds" ("Product") emblazoned across a red ribbon with glowing borders, above an orange polygon, evocative of fire, surrounded by almonds with a light salt coating, indicative of a smoking process.




36. The representations that the almonds' smoked taste is from being smoked over hardwoods, in a smokehouse, are false and misleading.

37. This is only disclosed through the fine print of the ingredients on the back of the package, which lists "Natural Hickory Smoke Flavor," a form of pyroligneous acid or synthesized liquid smoke.[13]



38. The Product is "misbranded" because describing the almonds' taste as

---

[13] **INGREDIENTS:** ALMONDS, VEGETABLE OIL (CANOLA, SAFFLOWER AND/OR SUNFLOWER), SALT, CORN MALTODEXTRIN, NATURAL HICKORY SMOKE FLAVOR, YEAST, HYDROLYZED CORN AND SOY PROTEIN, NATURAL FLAVORS.

deriving from a smokehouse and smoked over hardwoods "is false or misleading," because they were not subjected to any smoking over hardwoods, in a smokehouse or elsewhere. 21 U.S.C. § 343(a)(1); Conn. Gen. Stat. § 21a-102(a)(1).[14]

39.   The Product is "misbranded" because "Smokehouse Almonds" is not a truthful or non-misleading "common or usual name" for almonds that have not been smoked over hardwoods. 21 U.S.C. § 343(i); Conn. Gen. Stat. § 21a-102(a)(9).

40.   The name of "Smokehouse Almonds" is misleading because it does not disclose that its "characterizing properties or ingredients," a smoked taste, is from pyroligneous acid or synthesized liquid smoke, in place of being smoked over hardwoods, in a smokehouse. 21 C.F.R. § 102.5(a).

41.   This is because it fails to disclose the source of its smoked flavor, based on the use of liquid smoke instead of from being smoked, in a smokehouse. 21 C.F.R. § 101.22(i)(1).

42.   The FDA confirmed that "smoke ingredients are added flavors [and] should be declared in accordance with 21 C.F.R. § 101.22 [on the front of the label]."[15]

43.   Federal and state regulations require that because the almonds' taste is

---

[14] "Misbranded" is the statutory term for labeling that is false and/or misleading.

[15] FDA, Warning Letter, Smoked Seafood, Inc. dba Little Mermaid Smokehouse, MARCS-CMS 515739, June 27, 2017; FDA, Warning Letter, Walnut Creek Kitchens, Inc., CIN-15-436857-08, Nov. 27, 2014.

described as from a "Smokehouse," yet uses pyroligneous acid or synthesized liquid smoke instead of being smoked over hardwoods, "Smokehouse" "may be immediately preceded by the word 'natural' and shall be immediately followed by the word 'flavored'…e.g., 'Natural [Smokehouse] Flavored [Almonds]," or "[Smokehouse] Flavored [Almonds].'" 21 C.F.R. § 101.22(i)(1)(i).

44.   The FDA considered that representing foods as smoked over hardwoods when "true smoke is absorbed in a liquid or other medium, and that medium is added to a food to provide a smoke flavor," was misleading to consumers.

45.   The name of "Smokehouse Almonds" is misleading because it is not "uniform among all identical or similar products." 21 C.F.R. § 102.5(a); 21 C.F.R. § 101.3(b)(2)-(3).

46.   First, almonds from Planters, Walmart's Great Value, Aldi's Southern Grove, Target's Good & Gather, Safeway's Signature Select and Stop & Shop, are similar to Defendant's Smokehouse Almonds, yet conspicuously disclose their smoked taste is not from being smoked over hardwoods but from smoke flavoring, on the front label. 21 C.F.R. §§ 101.22(i)(1)(i) and (iii).

Smoked Almonds          Natural Smoke Flavored Almonds With
Naturally Flavored                Other Natural Flavors

Hickory Smoke Flavored Almonds

Hickory Smoked Flavored Almonds With Other Natural Flavor





Hickory Smoked Almonds
Naturally Flavored

Smoked Almonds Naturally Flavored





47.    These almonds' common or usual names of "Smoked Almonds Naturally Flavored," "Natural Smoke Flavored Almonds With Other Natural Flavors," "Hickory Smoke Flavored Almonds," "Hickory Smoked Flavored Almonds With Other Natural Flavor," and "Hickory Smoked Almonds Naturally Flavored," tells purchasers their smoked taste is not from being smoked over hardwoods, in a smokehouse, but from added smoke flavoring.

48.    Second, almonds from Nuts Aboutcha, Crimson Cove, and Smoke Shack Snacks, are labeled similar to Defendant's "Smokehouse Almonds," because they lack any front label disclosure that their smoked taste is from  pyroligneous acid or synthesized liquid smoke.

  

49. These almonds' common or usual names of "Hickory Smoked Almonds," "Smokehouse Almonds," and "A Smoky, Spicy Blend of Almonds, Pecans, & Walnuts," tells purchasers their smoked taste is only from being smoked over hardwoods, in a smokehouse, instead of from added smoke flavoring.

50. By representing the Product as "Smokehouse Almonds," they are labeled similarly to almonds of higher quality, which were made through burning of hardwoods, in a smokehouse, even though they were not subject to any smoking.

## VI. ALMONDS' SMOKED TASTE DISCLOSED OUTSIDE UNITED STATES

51. Outside of the United States, the Product is truthfully described as having a "Smokehouse Flavour."



52.   Previously, the Smokehouse Almonds were truthfully described as "hickory smoke flavored," even though they were made identically to those sold to consumers today.

 

53.   As a result of the false and misleading representations, the Product is sold at a premium price, approximately $3.19 for 12 oz pouches, $1.19 for 1.5 oz pouches, $9.99 for 40 oz pouches and $5.19 for 6 oz tins, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

## JURISDICTION

54.   Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

55.   The aggregate amount in controversy exceeds $5 million, including any statutory or punitive damages, exclusive of interest and costs.

56.   Plaintiff Jeska is a citizen of Connecticut.

57.   Defendant is a citizen of California based on its corporate formation.

58.   Defendant is a citizen of California based on its principal place of business.

59.   The Court has jurisdiction over Defendant because it transacts business within Connecticut and sells the Product to consumers within Connecticut from retail stores such as grocery stores, big box stores, bodegas, gas stations, warehouse club stores, drug stores, convenience stores, specialty grocery stores, ethnic food stores, gas station convenience stores, other similar locations, and online, to citizens of this State.

60.   Defendant transacts business in Connecticut, through the sale of the Product to citizens of Connecticut from retail stores such as grocery stores, big box stores, bodegas, gas stations, warehouse club stores, drug stores, convenience stores, specialty grocery stores, ethnic food stores, gas station convenience stores, other similar locations, and online, to citizens of this State.

61.   Defendant has committed tortious acts within this State through the distribution and sale of the Product, which is misleading to consumers in this State.

62.   Defendant has committed tortious acts outside this State by labeling, representing and selling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, type, origins, amount and/or quality, by regularly doing or soliciting business, or engaging in other persistent courses of conduct to sell the Product to consumers in this State, and/or derives substantial revenue from the sale of the Product in this State.

63.   Defendant has committed tortious acts outside this State by labeling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, type, origins, amount and/or quality, through causing the Product to be distributed throughout this State, such that it expects or should reasonably expect such acts to have consequences in this State and derives substantial revenue from interstate or international commerce.

**VENUE**

64.   Plaintiff Jeska resides in Litchfield County.

65.   Venue is in this Court, in the Hartford Division of this District, because a substantial or entire part of the events or omissions giving rise to Plaintiff Jeska's claims occurred in Litchfield County.

66.   Venue is in this Court, in the Hartford Division of this District, because Plaintiff Jeska's residence is in Litchfield County.

67.   Plaintiff Jeska purchased, used, and/or consumed the Product in reliance on the packaging, labeling, representations, and omissions identified here in Litchfield County.

68.   Plaintiff Jeska first became aware the packaging, labeling, representations, and omissions, were false and misleading, in Litchfield County.

**PARTIES**

69.   Plaintiff Lorianne Jeska is a citizen of Litchfield County, Connecticut.

70.   Plaintiff Julia Iassogna is a citizen of New Haven County, Connecticut.

71.   Plaintiff Tyoka Brumfield is a citizen of New Haven County, Connecticut.

72.   Defendant Blue Diamond Growers is a California agricultural cooperative with a principal place of business in California.

73.   Defendant is the largest cooperative of almond growers in the world.

74.   The Product is sold in various sizes with uniform representations, omissions, labeling, and packaging, whether sold in cans, pouches, etc.

75.   Plaintiffs are like most consumers and prefer foods without additives, based on the belief they are potentially harmful, not natural, and unhealthy.

76.   Plaintiffs are like most consumers and prefer foods which get their taste from a natural production process, like being smoked over hardwoods or barbecued, instead of added flavorings designed to mimic the taste from smoking or barbecuing.

77.   Plaintiffs are like most consumers and look to the front label of foods to see what they are buying and to learn basic information about it.

78.   Plaintiffs are like most consumers and are accustomed to the front label of packaging telling them if what they are buying gets its taste from its ingredients, production processes, or additives.

79.   Plaintiffs are like most consumers and when they see a front label which does not disclose added flavoring, they expect its taste is from any identified ingredients or production processes.

80.   Plaintiffs read, saw, and relied on the packaging and labeling of "Smokehouse Almonds," emblazoned across a red ribbon with glowing borders, above an orange polygon, evocative of fire, above almonds with a light salt coating, indicative of a smoking process.

81.   Plaintiffs expected the Product's smoked taste would be from smoking

over hardwoods, such as would be done in a smokehouse, and not pyroligneous acid or synthesized liquid smoke.

82.   Plaintiffs relied on the omission of added smoke flavoring from the front label as it related to the almonds' smoked taste.

83.   Plaintiffs did not expect that instead of the almonds' smoked taste coming from smoking over hardwoods, such as would be done in a smokehouse, it would be from pyroligneous acid or synthesized liquid smoke.

84.   Plaintiffs bought the Product with the labeling identified here, "Smokehouse Almonds," emblazoned across a red ribbon with glowing borders, above an orange polygon, evocative of fire, above almonds with a light salt coating, indicative of a smoking process, at around the above-referenced price.

85.   Plaintiffs purchased the Product between February 2020 and February 2024, at grocery stores, big box stores, bodegas, gas stations, warehouse club stores, drug stores, convenience stores, specialty grocery stores, ethnic food stores, gas station convenience stores, and/or other similar locations in Connecticut.

86.   Plaintiffs paid more for the Product than they would have had they known its smoked taste was not from smoking over hardwoods, such as would be done in a smokehouse, but from pyroligneous acid or synthesized liquid smoke, as they would not have bought it or would have paid less.

87.   The Product was worth less than what Plaintiffs paid, and they would not

have paid as much absent Defendant's false and misleading statements and omissions.

88.  Plaintiffs chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, features, and/or components.

## CLASS ALLEGATIONS

89.  Plaintiffs seek to represent the following class:

> All persons in Connecticut who purchased the Product in Connecticut during the statutes of limitations for each cause of action alleged, expecting the almonds were subjected to smoking, such as in a smokehouse.

90.  Excluded from the Class are (a) Defendant, Defendant's board members, executive-level officers, and attorneys, and immediate family members of any of the foregoing persons, (b) governmental entities, (c) the Court, the Court's immediate family, and Court staff and (d) any person that timely and properly excludes himself or herself from the Class.

91.  Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiffs and class members are entitled to damages.

92.  Plaintiffs' claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive

representations, omissions, and actions.

93.   Plaintiffs are adequate representatives because their interests do not conflict with other members.

94.   No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

95.   Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

96.   The class is sufficiently numerous, with over 100 members, because the Product has been sold throughout the State for several years with the representations, omissions, packaging, and labeling identified here, at hundreds of retail locations and online to citizens of this State.

97.   Plaintiffs' Counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

## CAUSES OF ACTION

### COUNT I
Connecticut Unfair Trade Practices Act ("CUTPA"),
Conn. Gen. Stat § 42-110a, *et seq.*

98.   Plaintiffs incorporate by reference paragraphs 1-53.[16]

99.   The purpose of the CUTPA is to protect consumers against unfair and deceptive practices.

_____

[16] To the extent any incorporation by reference is required.

26

100. This includes making state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection.

101. The CUTPA considers false advertising, unfair acts, and deceptive practices in the conduct of any trade or commerce to be unlawful.

102. Violations of the CUTPA can be based on other laws and standards related to consumer deception.

103. Violations of the CUTPA can be based on the principles of the Federal Trade Commission Act ("FTC Act") and FTC decisions with respect to those principles. 15 U.S.C. § 45 *et seq*.

104. A CUTPA violation can occur whenever any rules promulgated pursuant to the FTC Act, 15 U.S.C. § 41 *et seq*., are violated.

105. A CUTPA violation can occur whenever the standards of unfairness and deception set forth and interpreted by the FTC or the federal courts relating to the FTC Act are violated.

106. A CUTPA violation can occur whenever any law, statute, rule, regulation, or ordinance which proscribes unfair, deceptive, or unconscionable acts or practices is violated.

107. In considering whether advertising is misleading in a material respect, the FTC Act recognizes that the effect of advertising includes not just representations made or suggested by words and images, "but also the extent to which [it] fails to

reveal facts material in the light of such representations." 15 U.S.C. § 55(a)(1).

108. In considering whether a food's label is misleading, it is required to consider not only representations made or suggested by statements, images, and/or design, but also the extent to which such labeling or advertisement fails to prominently and conspicuously reveal facts relative to the proportions or absence of certain ingredients or other facts concerning ingredients or attributes of the food, which are of material interest to consumers.

109. Defendant's false and deceptive representations and omissions with respect to the Product's contents, origins, type, and/or quality, that the almonds' smoked taste was from smoking over hardwoods, such as would be done in a smokehouse, even though it was from pyroligneous acid or synthesized liquid smoke, are material in that they are likely to influence consumer purchasing decisions.

110. This is because consumers (1) prefer foods without additives, due to reasons including health, nutrition, and a desire to consume natural foods, (2) prefer foods which get their taste from highlighted ingredients or production processes instead of chemicals designed to imitate those ingredients or production processes, (3) prefer foods made in traditional methods, such as through barbecuing or smoking, and (4) prefer the taste of foods smoked over hardwoods to those which only have added smoke flavoring, which is unable to replicate the balance of

28

compounds from the combustion of hardwoods and smoke generated.

111. The replacement of a smoking process over hardwoods, as would occur in a smokehouse, is of material interest to consumers, because (1) smoking over hardwoods is more expensive than added liquid smoke flavoring, (2) smoking over hardwoods is a natural process, and safer than liquid smoke flavorings, reported to potentially be unsafe in certain respects, and (3) consumers prefer foods which get their taste from highlighted ingredients or production processes instead of chemicals designed to imitate those ingredients or production processes.

112. The labeling of the Product violated the FTC Act and thereby violated the CUTPA because the representations, omissions, packaging, and labeling, "Smokehouse Almonds," emblazoned across a red ribbon with glowing borders, above an orange polygon, evocative of fire, above almonds with a light salt coating, indicative of a smoking process, created the erroneous impression the almonds' smoked taste was from smoking over hardwoods, such as would be done in a smokehouse, when this was false, because it was from pyroligneous acid or synthesized liquid smoke.

113. The labeling of the Product violates laws, statutes, rules and regulations which proscribe unfair, deceptive, or unconscionable acts or practices, thereby violating the CUTPA.

114. Violations of the CUTPA can be based on public policy, established

through statutes, law, or regulations.

115. The labeling of the Product violates laws, statutes, rules and regulations that are intended to protect the public.

116. The labeling of the Product violated the CUTPA because the representations, omissions, labeling, and packaging, "Smokehouse Almonds," emblazoned across a red ribbon with glowing borders, above an orange polygon, evocative of fire, above almonds with a light salt coating, indicative of a smoking process, when the almonds' smoked taste was not from smoking over hardwoods, such as would be done in a smokehouse, because it was from pyroligneous acid or synthesized liquid smoke, was unfair and deceptive to consumers.

117. The labeling of the Product violated the CUTPA because the representations, omissions, packaging, and labeling of "Smokehouse Almonds," emblazoned across a red ribbon with glowing borders, above an orange polygon, evocative of fire, above almonds with a light salt coating, indicative of a smoking process, when this was false, because the almonds' smoked taste was not from smoking over hardwoods, such as would be done in a smokehouse, but from pyroligneous acid or synthesized liquid smoke, was contrary to the CFDCA, which adopted the FFDCA and accompanying regulations.

118. The FFDCA and CFDCA prohibit consumer deception by companies in the labeling of food.

| Federal | State |
|---|---|
| 21 U.S.C. § 343(a)(1) | Conn. Gen. Stat. § 21a-102(a)(1) |
| 21 U.S.C. § 343(i) | Conn. Gen. Stat. § 21a-102(a)(9) |
| 21 C.F.R. § 101.3(b) | |
| 21 C.F.R. § 101.22(i)(1)(i) | Regs., Conn. State Agencies § 21a-115-48 |
| 21 C.F.R. § 101.22(i)(1)(iii) | |
| 21 C.F.R. § 102.5(a) | Regs., Conn. State Agencies § 21a-115-49 |

119. Plaintiffs believed the almonds' smoked taste was from smoking over hardwoods, such as would be done in a smokehouse, even though they were not subject to any smoking, and their smoked taste was from pyroligneous acid or synthesized liquid smoke.

120. Plaintiffs paid more for the Product and would not have paid as much if they knew that the almonds' smoked taste was not from smoking over hardwoods, such as would be done in a smokehouse, because they were not subject to any smoking, because their smoked taste was from pyroligneous acid or synthesized liquid smoke.

121. Plaintiffs seek to recover for economic injury and/or loss they sustained based on the misleading labeling and packaging of the Product, a deceptive practice under the CUTPA.

122. Plaintiffs will produce evidence showing how they and consumers paid more than they would have paid for the Product, relying on Defendant's

representations, omissions, packaging, and labeling, using statistical and economic analyses, hedonic regression, hedonic pricing, conjoint analysis, and other advanced methodologies.

123. As a result of Defendant's misrepresentations and omissions, Plaintiffs were injured and suffered damages by their payment of a price premium for the Product, which is the difference between what they paid based on its labeling, packaging, representations, statements, omissions, and/or marketing, and how much it would have been sold for without the misleading labeling, packaging, representations, statements, omissions, and/or marketing identified here.

<u>Jury Demand and Prayer for Relief</u>

Plaintiffs demand a jury trial on all issues.

**WHEREFORE**, Plaintiffs pray for judgment:

1. Declaring this a proper class action, certifying Plaintiffs as representatives and the undersigned as Counsel for the class;

2. Awarding monetary damages and interest;

3. Awarding costs and expenses, including reasonable fees for Plaintiffs' attorneys and experts; and

4. Other and further relief as the Court deems just and proper.

Dated:   April 11, 2024

Respectfully submitted,

/s/  Joshua D. Levin-Epstein

Levin-Epstein & Associates P.C.
777 W Putnam Ave Ste 300
Greenwich CT 06830
Tel. No.: (212) 792-0046
joshua@levinepstein.com

*Notice of Lead Counsel Designation:*


*Lead Counsel for Plaintiffs*

Joshua D. Levin-Epstein

Levin-Epstein & Associates P.C.

*Counsel for Plaintiffs*

**Certificate of Service**

I certify that on April 11, 2024, I served and/or transmitted the foregoing by the method below to the persons or entities indicated, at their last known address of record (blank where not applicable).

|  | CM/CEF | First-Class Mail | Email | Fax |
|---|---|---|---|---|
| Defendant's Counsel | ☐ | ☐ | ☐ | ☐ |
| Plaintiffs' Counsel | ☒ | ☐ | ☐ | ☐ |
| Court | ☒ | ☐ | ☐ | ☐ |

  /s/ Joshua D. Levin-Epstein

34